**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR-N-04-30033-MAP |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| CHRISTOPHER ASSELIN, | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM FOR**
**DEFENDANT CHRISTOPHER ASSELIN**

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney, hereby files the Government's Sentencing Memorandum for defendant Christopher Asselin.

The government respectfully submits that the defendant warrants the maximum Guidelines sentence of 24 months and a fine of $174,772.70. The defendant's request for a downward departure or non-Guidelines sentence based on his physical health and family circumstances is baseless and should be rejected.

I.    Background

    A.    The Defendant's Offense Conduct

        As set forth in far greater detail in the Pre-Sentence Report dated December 14, 2006 and revised January 11, 2007 (the "PSR"), the defendant participated in a vast and damaging series of crimes

1

centered around the corrupt operation of the Springfield Housing Authority (the "SHA") by his father, Raymond Asselin, Sr. and Arthur Sotirion.

In particular, the defendant pleaded guilty to the following charges in the Second Superseding Indictment (the "Indictment"): conspiracy to commit bribery (Count 3), in violation of 18 U.S.C. § 370 and 201; conspiracy to commit theft against the government (Count 85), in violation of 18 U.S.C. §§ 370 and 641; and conspiracy to commit mail and wire fraud (Count 86), in violation of 18 U.S.C. §§ 370, 1341, 1343, and 1346.

Count 3. In connection with the bribery conspiracy charged in Count 3, the defendant received a wide variety of gratuities, including:

1. Approximately 40,000 to 60,000 letters and 30,000 to 40,000 envelopes for the defendant's 1998 campaign for state representative;

2. Catering services for one of the defendant's campaign functions;

3. A Dell Pentium computer, office table, and highback leather chair for the defendant's office;

4. New windows, including materials and labor, for the defendant's home;

5. Tree service work to prepare for the installation of an in-ground swimming pool at the defendant's home;

6.  Purchase and installation of an in-ground swimming pool and slide at the defendant's home;

7.  Exterior painting of the defendant's home;

8.  Additional campaign letters (approximately 20,000 to 30,000) and campaign envelopes (approximately 10,000 to 15,000);

9.  A washer and dryer;

10. Catering services for another of the defendant's political event;

11. Free labor and materials for plumbing at the defendant's home;

12. New house roof and shed roof at the defendant's home;

13. Twenty "Chris Asselin State Representative" signs;

14. Additional campaign letters (approximately 60,000 to 80,000) and campaign envelopes (approximately 40,000 to 50,000);

15. Plumbing services for the installation of a 400,000 BTU pool heater at the defendant's home;

16. New cherry kitchen cabinets at the defendant's home;

17. Additional exterior painting of the defendant's home;

18. Labor to install ceramic tile at the defendant's home;

19. Sanding and refinishing five rooms at the defendant's home;

20. Fourteen storm windows installed at the defendant's home;

21. Four double-hung windows at the defendant's home;

22. Living room, hallway, and television room carpeting at the defendant's home in 1996;

23. Additional carpeting at the defendant's home in 1998;

24. Office carpeting at the defendant's political office;

25. Free gifts for the 2002 "Committee to Elect Christopher Asselin" golf fundraiser;

26. Rough and finish electrical wiring of the defendant's home; and

27. Electrical service to wire the in-ground pool heater at the defendant's home.

The defendant is ultimately responsible for approximately $87,386.35 in gratuities. See Indictment, Racketeering Acts 27, 48, 54-56, 58, 59, 60, 63-65, 75, 76, 80, 92, 94, 100-04, 106, 111, 115, 119, 133, 154, and 157.[1]

Count 85. In connection with the defendant's theft charged in Count 85, the defendant is responsible, either through his direct

---

[1] In addition to the items specified in the Racketeering Acts, the defendant received $2,000 worth of free plumbing supplies from Springfield Plumbing, $3,000 in cash contributions gathered by corrupt SHA contractor Frank Ware, and at least $500 in cash contributions from corrupt SHA contractor William Pappas.

knowledge or reasonable foreseeability, for approximately $66,115.82 in home improvement expenses, automotive repair payments, and other personal expenditures.

Notably, the loss figure in Count 85 understates the seriousness of the defendant's offense since it does <u>not</u> capture a substantial amount of theft attributable to the defendant. For example, the loss figure does not include a wide range of SHA equipment and supplies that SHA procurement officer Francis Maroney stole for the defendant's home and office, including: lawn mowers, weed whackers, snow blowers, power tools, tile, paint, stain, wallpapers, lumber, plates, napkins, cups, office supplies, picture frames, rolls of film, and electrical fixtures. PSR ¶ 204.

Further, the loss figure excludes the stolen wages of Clifford Jorgenson and George Williamson, who performed a wide range of work at the defendant's home and office. <u>See</u> Testimony of George Williamson, Transcript of Trial, <u>United States v. Peter Davis</u>, 04-30033-MAP ("T.") at 1891-94. For example, Williamson and Jorgenson spent substantial time at the defendant's home, relocating the defendant's clothes line, installing ceramic tile, relocating a washer/dryer, and removing a boiler. At the defendant's political office, Williamson and Jorgenson also installed a water bubbler, moved a four-foot light fixture, removed wooden window seats, and installed carpet. Williamson and others at SHA, including Sotirion's secretaries Virma Santiago and Betsy Torres, made

campaign signs for the defendant's fundraisers.  Once, Williamson was even conscripted into driving from Springfield to Chicopee to repair a vandalized campaign sign, even though the sign was located just down the street from the defendant's own political office.  T. at 1891-94.

The defendant well knew that he was receiving these illicit benefits.  When Jorgenson was performing roofing work on the defendant's home, the defendant arrived and ordered Jorgenson off the roof to scold him for wearing an official SHA shirt while doing the work.  PSR ¶ 42.

Lastly, the loss figure does not include the wages that SHA lost in approximately 1996 when its employee Ray Descoteau (now deceased) spent several weeks of SHA time painting the interior of the defendant's home, including a kitchen, living, dining room, and several bedrooms.  See Testimony of Charles Lysak, T. at 1910.

Count 86.  The defendant unsuccessfully campaigned for state representative for the 9th Hampden District in November 1998, but successfully ran in November 2000 and was re-elected in November 2002.  In this campaign finance mail and wire fraud scheme, the defendant fraudulently concealed campaign expenses paid by SHA and SHA contractors, illegal cash contributions made by various individuals, and labor performed by SHA employees on SHA time from his political opponents, the voters of the 9th Hampden District and the general public.  PSR, pages 44-47.

Racketeering Acts 27, 48, 54, 64, 75, 92, 133, 216, 218, 219, 221, 231, 234, 235 and Overt Acts 82 and 85 of Count 85 set forth the amount of fraud that can be reasonably be attributable to the defendant because of his direct knowledge or reasonable foreseeability. The amount of fraud equals $36,279.86.

That amount is increased to total of $40,279.86 by adding the following sums: the $3,000.00 in cash contributions raised by Frank Ware and seized during the September, 2002 search warrant at Christopher Asselin's residence, PSR ¶ 231; at least $500.00 in cash contributions from William Pappas, PSR ¶ 229; and at least $500.00 in cash contributions from Christopher Asselin's sister in law, PSR ¶ 232.

As with Count 85, this overall total does not fully capture the seriousness of the offense, since it omits an unquantifiable amount for labor by SHA employees who built campaign signs, copied campaign literature, stuffed envelopes, and performed other campaign tasks on SHA time. For example, Sotirion's secretary Betsaida Torres testified that at Sotirion's direction, she performed private work for the defendant beginning with his first campaign. Testimony of Betsaida Torres, T. at 2008. Torres "did all his banners, his campaign posters, his flyers." Torres estimated that on the first campaign, she spent an entire month of eight-hour days (plus overtime) working for the defendant, rather than for SHA. T. at 2010. This amount also omits the campaign contributions by

contractors, such as Gary Baribeau, Nicholas Katsounakis, and others, who felt compelled to contribute due to their business relationship with SHA.

28.  The Impact On Victims

As set forth above, the actual fraud and loss amounts specified for Counts 85 and 86 understate the seriousness of the offenses because some of the theft and fraud could not be calculated with precision.  Moreover, dollar figures simply do not reflect the true harm caused by the defendant.  For example, the harm done to the voters of the 9th Hampden District, the defendant's political competitors, and the general public as a result of Count 86 is simply immeasurable.  The defendant's crimes struck at the very heart of the political process, which cannot function without a level playing field for all participants.  The defendant's corrupt campaign manipulation undermines the bedrock faith that voters and political candidates invest in the process in order to participate in elections.

Further, as the SHA Board of Commissioners made clear in its Victim Impact Statement dated November 22, 2006 (the "Impact Statement"), "[m]any have been victimized and it will take a very long time to recover. . . . [t]he victim impacts have been severe." Impact Statement, at 1, 7.  As the Impact Statement demonstrates, the loss figure attributed to any one defendant simply cannot capture the full extent of the harm caused by the defendants'

crimes.  The defendants' crimes "have broken that essential trust with tenants, vendors, federal and state funding sources, and the general public." Id. at 2.  Such damage to the public trust is, literally, incalculable.

As one concrete example of this intangible harm, SHA lost its classification as a high-performing agency, which in turn resulted in the loss of essential federal funds.  Id. at 3.  In order to regain this valuable status and bring the SHA back to even keel, SHA had to devote "[t]housands of hours of time."  The Board attests that "[i]t would take a forensic accountant to put a true dollar value on the effort," which cost an estimated "hundreds of thousands of dollars in time and talent." Id. at 3.  Moreover, when SHA fails to obtain funding because of its criminal past, "the victims are the seniors and the disabled individuals who are the intended beneficiary" of the funds.  Id. at 4.

Further, as many of SHA's buildings are "nearing functional obsolesence," the cupidity of the defendant, who received numerous benefits to his private home, stands in stark relief.  Id. at 5.  In sum, as the SHA Board recognized, "the totality of the corruption is jaw-dropping." Id. at 6-7.

II.  The Defendant Merits A Guidelines Sentence

A.   The Loss Estimate Does Not Overstate His Offenses

The defendant incorrectly contends that the loss overstates the seriousness of his offense.  First, the PSR's calculations actually

9

*underestimate* the seriousness of his offenses, since as set forth above they do not capture all of the tangible benefits obtained by the defendant in the schemes, nor do they reflect the intangible harm caused by his corrosive conduct, as illustrated by the SHA Impact Statement.

Second, the defendant cannot deflect guilt away from himself with wan, self-serving claims that he was not aware that he received certain benefits (<u>see</u> Defendant's Objection to PSR ¶ 113, 204) or that he believed that certain benefits were simply gifts from his father or brother (<u>see</u> Defendant's Objection to PSR ¶¶ 91, 138-40, 155). Given the defendant's central position as the state representative and as well as his overwhelming participation in all of the schemes, the PSR amply establishes that the defendant either knew or reasonably should have known or foreseen that he was receiving these benefits illicitly.

Finally, the defendant's reliance on <u>United States v. Turner</u>, 465 F.3d 667 (6th Cir. 2006) is misplaced. As an initial matter, <u>Turner</u> is not controlling authority and has not been followed, or even cited, by any other court for the proposition that Section 1346 does not cover the type of honest services fraud alleged in Count 86. Second, <u>Turner</u> involved only one election cycle, whereas here the scheme spanned three elections (1998, 2000, and 2002). Because the defendant had won the 2000 election and thus was already a sitting state representative during the 2002 campaign, the

10

indictment correctly alleged an honest services scheme to defraud - indeed, the defendant pleaded guilty to this offense, thus waiving any claim of legal insufficiency. The loss amount should not be reduced because the loss involving the 1998 and 2000 campaigns should at the very least be considered relevant conduct.

> B. The Defendant's Physical Health And Family Circumstances Do Not Warrant Departure Or A Non-Guidelines Sentence

> 1. The Defendant's Physical Health Is Not Extraordinary

Section 5H1.4 of the United States Sentencing Guidelines provides in pertinent part:

> Physical condition . . . is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be a reason to impose a sentence below a guideline range; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

U.S.S.G. § 5H1.4.

A discouraged factor such as health should only be considered where manifested "in unusual kind or degree." United States v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993). If a sentencing court finds that a defendant does not suffer from a form of "extraordinary physical impairment," the court may not then depart the defendant's sentence downward. United States v. Hilton, 946 F.2d 955, 960 (1st Cir. 1991).

In interpreting Section 5H1.4, the First Circuit has indicated that a defendant's physical condition is not sufficiently

11

extraordinary to warrant a departure if "the Bureau of Prisons could adequately accommodate [his] medical needs." Id. at 960; see United States v. Studley, 907 F.2d 254, 258 (1st Cir. 1990)("[a] defendant's unique mental or emotional condition is only relevant if the [BOP] does not have adequate treatment services."). As the First Circuit explained, adequate treatment services are on "'a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards.'" United States v. Derbes, 369 F.3d 579, 583 (1st Cir. 2004) (quoting United States v. DeCologero, 821 F.2d 39, 43 (1st Cir. 1987)).

Here, because the defendant's medical condition is not extraordinary, the Court should reject any request for a departure or non-Guidelines sentence based upon his health. The defendant has what he describes as only a "mild form" of Klinefelter's Syndrome, which is likely to require testosterone replacement therapy "when he reaches middle age." PSR ¶ 317. In addition, in 2002, the defendant suffered a "mild" stroke, was treated, and "quickly recovered." Id.

These mild health issues, alone or together, do not warrant a non-Guidelines sentence. Even in cases where defendants have established a more severe illness, the First Circuit has not found that a downward departure is warranted. For example, in United States v. Rivera-Maldonado, 194 F.3d 224 (1st Cir. 1999), the defendant was diagnosed as HIV-positive and had a dependent child with AIDS. The First Circuit stated:

> Only an "extraordinary physical impairment"
> may justify a sentence other than
> imprisonment. AIDS is not such a "physical
> impairment"; nor is cancer or various other
> terminal or life threatening conditions. The
> Bureau of Prisons . . . has the medical
> personnel and facilities required to furnish
> defendant with the care and treatment he
> needs. Indeed, defendant is entitled to that
> care and treatment. . . . In sum, defendant's
> physical condition, while lamentable, is no
> basis for a departure. Except in
> extraordinary circumstances not present here,
> terminally ill persons who commit serious
> crimes may not use their affliction to escape
> prison. Were this rule otherwise, the law's
> deterrent effect would be unreasonably and
> unnecessarily diminished in the case of
> terminally ill persons.

Id. at 236, n. 14 (quoting United States v. DePew, 751 F. Supp.

1195, 1199 (E.D. Va. 1990)); see United States v. Lujan, 324 F.3d 27,

33 (1st Cir. 2003) (defendant's cirrhosis and calcified arteries did

not warrant departure); United States v. LeBlanc, 24 F.3d 340, 348-49

(1st Cir. 1994) (heart condition did not warrant departure); United

States v. Woodward, 277 F.3d 87, 90, 92 (1st Cir. 2002) (no departure

for defendant with a large number of "severe and very life limiting"

physical infirmities - including being paralyzed and confined to a

wheelchair, having three blocked arteries in his heart and diabetes,

taking 10-14 medications, and having been hospitalized many times).

Similarly, other courts have denied departures notwithstanding

physical conditions more severe than the conditions presented by the

defendant here. E.g., United States v. Johnson, 318 F.3d 821, 826-27

(8th Cir. 2003) (coronary heart disease and Hodgkins disease, and

reversing departure); <u>United States v. Krilich</u>, 257 F.3d 689, 692 (7th Cir. 2001) (69-year old defendant with pulmonary, cardiovascular, and peripheral vascular disease, and reversing departure); <u>United States v. Persico</u>, 164 F.3d 796, 801 (2d Cir. 1999) (triple bypass, kidney cancer, hypertension); <u>United States v. Guajardo</u>, 950 F.2d 203, 208 (5th Cir. 1991) (cancer, high blood pressure, amputee); <u>United States v. Carey</u>, 895 F.2d 318, 324 (7th Cir. 1990) (brain tumor); <u>United States v. Seward</u>, No. 97 CR 851, 2002 WL 31103488, at *3 (N.D. Ill. Sept. 19, 2002), 2002 WL 31103488, at *3 (76-year old defendant with diabetes, hypertension and ulcers); <u>United States v. Tolson</u>, 760 F.Supp. 1322, 1331 (N.D. Ind. 1991) (pulmonary condition); <u>United States v. DePew</u>, 751 F. Supp. 1195, 1199 (E.D. Va. 1990) (AIDS).

2.    The Defendant's Family Circumstances Are Not Extraordinary

Section 5H1.6 of the Sentencing Guidelines states that "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6. The First Circuit only rarely affirms departures for exceptional family circumstances, such as when a defendant was so irreplaceable that incarceration would cause exceptional hardship to his family. <u>United States v. Rosselli</u>, 366 F.3d 58, 68 (1st Cir. 2004). In order to determine whether this limited circumstance exists, the district court must inquire as to whether there are "feasible alternatives of care that are relatively comparable to what the

14

defendant provides." <u>United States v. Pereira</u>, 272 F.3d 76, 82 (1st Cir. 2001).  As the First Circuit has recognized, "[a] defendant's incarceration will invariably cause hardship to his family," <u>United States v. Louis</u>, 300 F.3d 78, 82 (1st Cir. 2002), and "immense hardships" fall within the heartland of family circumstances that do not warrant departure.  <u>Pereira</u>, 272 F.3d at 81 (collecting cases).

The First Circuit has disapproved departures in cases with family circumstances far more extraordinary than this defendant's. <u>See</u> <u>United States v. Claudio</u>, 44 F.3d 10, 16 (1st Cir. 1995) (affirming district court's denial of departure based upon defendant's need to care for 12-year old son suffering from neurological condition and learning disorder); <u>United States v. Chestna</u>, 962 F.3d 103, 107 (1st Cir. 1992) (holding departure was not warranted for defendant who was the single mother of four young children); <u>United States v. Rushby</u>, 936 F.2d 41, 42-43 (1st Cir. 1991) (holding that defendant's steady employment for ten years, status as main breadwinner for wife and two children, and aid to wife's grandmother "are simply not sufficient to invoke the exceptions implied by the word 'ordinary' in §5H1.6"); <u>United States v. Carr</u>, 932 F.2d 67, 72-73 (1st Cir. 1991) (reversing departure where defendant and her husband both faced prison terms because defendant's mother could take care of their young child).

Consistent with these decisions from the First Circuit, this Court very recently refused to grant a departure based upon far more

deserving family circumstances. United States v. Naomi Watford, 05-30057-MAP (January 16, 2006). In Watford, the defendant was the primary caregiver for four young children (aged between 1 and 11) who were present during an armed home invasion, in which she was severely beaten. The defendant had proffered a detailed expert psychological evaluation which concluded that the defendant's imprisonment would have a "pronounced and deleterious effect" on the children, whose father had been recently incarcerated. Nonetheless, this Court held that the defendant's circumstances did not suffice to warrant a departure and sentenced her to three years in prison - one more year than the maximum guidelines sentence facing the instant defendant.

Here, the defendant's twin daughters (both aged 5) will be cared for by their mother, Merylina Asselin, who received a pretrial diversionary disposition in this case. PSR § 315. Moreover, the stress that the defendant's wife and daughters have experienced from this prosecution, while unfortunate, is "simply not sufficient to invoke the exceptions implied by the word 'ordinary' in §5H1.6." Rushby, 936 F.2d at 42-43. Because the defendant is hardly irreplaceable during the period of his incarceration, his request for a family circumstances departure should be denied.

### 3. Nature and Circumstances of the Offense

The nature and circumstances of the offense warrant a Guidelines sentence. As set forth above, the defendant engaged in

an astonishing range of bribery, theft, and campaign fraud.  The defendant also took steps to conceal his crimes, such as plotting the back-dating of invoices to appear that his campaign had paid for van services to transport SHA residents to and from the voting booths in 2002, PSR ¶ 236; concocting a false explanation for illicit cash by casting the money as gambling winnings of his sister's dead husband, PSR ¶ 267; berating his sister for calling the SHA maintenance office directly, PSR ¶ 208; and castigating an SHA worker for wearing his SHA shirt in public while performing work at the defendant's home, PSR ¶ 220.

Given the seriousness of the underlying offenses, and the defendant's central role, the nature and circumstances of the offense require a Guidelines sentence.  See 18 U.S.C. § 3553(a)(1).

    4.  History and Characteristics of the Defendant

The personal characteristics of the defendant weigh in favor of a Guidelines sentence.  Unlike most defendants who come before this Court, the defendant has enjoyed a life of rare privilege and affluence.  He was raised in "an emotionally and economically secure environment" in his family's home in Springfield, MA.  PSR ¶ 307. He graduated from a prestigious local private school and then received a bachelor's degree and a master's degree from local colleges.  PSR ¶ 320.  He moved into his own home when he was 27 years old.  PSR ¶ 315.  The defendant has no history of mental health problems or substance abuse, PSR ¶ 319, and is embraced by a

loving family that remains loyal and close in spite of the instant prosecution.

During the defendant's offenses, he was gainfully employed in a variety of well-paying jobs, including legislative aide at the statehouse, purchasing agent for the Holyoke Soldier's Home, and state representative. PSR ¶¶ 324-326. The defendant owns several vehicles and has a net worth of $214,290. PSR ¶¶ 70-71.

In sum, the defendant's life reveals no extenuating circumstances that might have motivated him to commit his crimes. Instead, as an educated person of relative affluence, the defendant well knew right from wrong and had absolutely no financial need to commit the crime. Thus, it appears that only his naked arrogance and greed motivated him to commit his crimes.

Moreover, the defendant's position as a legislator - a maker of laws - starkly contrasts with his conduct in breaking the law. The public rightly expects - and deserves - better from its legislators.

As a result, his personal circumstances aggravate, rather than mitigate, the seriousness of his crimes. At the very least, his history and characteristics warrant a Guidelines sentence. See 18 U.S.C. § 3553(a)(1).

     5.   The Need for the Sentence Imposed

A Guidelines sentence is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

Here, the defendant participated in offenses that ultimately harmed the SHA and its needy tenants, its contractors, and its administrators, as well as his political opponents, the voters of the 9th Hampden District, and the general public.

In this case, where the defendant participated in a series of crimes marked by naked greed and brazen disrespect for his position as a lawmaker, only a Guidelines sentence will promote "respect for the law" and "provide just punishment." 18 U.S.C. § 3553(a)(2)(A). Moreover, a Guidelines sentence would provide general deterrence for others similarly situated in society. See 18 U.S.C. § 3553(a)(2)(B).

6. The Defendant's Advisory Guidelines Range

The government respectfully submits that paragraph 290 of the PSR mistakenly assesses a two-level decrease for the defendant's role in Count 86 as well as Count 85. While the government agrees that the defendant merits a two-level role reduction in Count 85, no such reduction is warranted for Count 86. To the contrary, with respect to Count 86, which alleged a campaign fraud scheme, the defendant merits a two-level role increase for abuse of a position of public trust, pursuant to Section 3B1.3.

The defendant unsuccessfully campaigned for state representative for the 9th Hampden District in November 1998, but successfully ran in November 2000 and was re-elected in November 2002. In the campaign finance mail and wire fraud scheme, the

19

defendant fraudulently concealed campaign expenses paid by SHA and SHA contractors, illegal cash contributions made by various individuals, and labor performed by SHA employees on SHA time from his political opponents, the voters of the 9th Hampden District and the general public.  PSR, pages 44-47.  In this scheme, the defendant, with the help of his family and corrupt SHA contractors, effectively purchased his elections in 2000 and 2002 without the public ever knowing the fraud that had been perpetrated.

Section 3B1.2 "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. §3B1.2, Commentary, Application Note 3(A).  The determination to award a role reduction is "heavily dependent upon the facts of the particular case."  U.S.S.G. §3B1.2, Commentary, Application Note 3(C).

A defendant who seeks a downward adjustment stemming from a claimed peripheral role in the offense bears the burden of proof. United States v. Ocasio, 914 F.2d 330, 332-33 (1st Cir. 1990).  To qualify for a minor role reduction under Section 3B1.2(b), the defendant must satisfy a two-pronged test.  First, he must demonstrate that he is less culpable than most of those involved in the offenses of conviction.  See United States v. Santos, 357 F.3d 136, 142 (1st Cir. 2004); Ocasio, 914 F.2d at 333.  Second, he must establish that he is less culpable than most of those who have

committed similar crimes.  <u>Santos</u>, 357 F.3d at 142; <u>Ocasio</u>, 914 F.2d at 333.

Section 3B1.3 provides a two-level increase "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. §3B1.3.  "For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense." U.S.S.G. §3B1.3, Commentary, Application Note 1.

The essence of the fraud conspiracy charged in Count 86 is the mailing and/or wiring of false campaign finance reports to the Commonwealth's Office of Campaign and Political Finance, since the reports failed to report campaign expenses paid by SHA vendors and SHA, labor provided by SHA employees on SHA time, and all cash contributions made to the Committee to Elect Christopher Asselin. Indictment, ¶¶ 89, 101, 106, 110.

Bradley Balzer, the deputy director of the Massachusetts Office of Campaign and Political Finance, testified that the campaign finance reports are all signed under penalties of perjury by the candidate himself.  Testimony of Bradley Balzer, T. at 2145-46.

Here, as the candidate, the defendant was the required signator on all of the false campaign finance reports, the principal (really the sole) beneficiary of the scheme, and a primary architect of the fraud.  <u>See</u>, e.g., PSR ¶ 229 (defendant knew that reports did not

disclose cash contributions); ¶ 231 ($3,000 in cash from Frank Ware found in defendant's bedroom dresser); ¶ 232 (defendant participated in conversation in which family members were directed to find straw contributors who could take cash and write out a check to defendant's campaign); ¶ 235 (defendant knew that his campaign expenses were funneled through SHA); and ¶ 236 (defendant discussed backdating invoices and checks so that it appear that his campaign had paid for various services that it received for free).

As these facts demonstrate, the defendant not only played a pivotal role in the fraud, but his position also significantly facilitated the fraud.   Indeed, given that the defendant as candidate had to sign the reports, the fraud could not have occurred without him.

As a result, the PSR should be corrected to state that the Adjusted Offense Level for Group II (comprising both Count 85 and 86) is calculated as follows:

| | |
|---|---|
| Base Offense Level: <br> (§2B1.1(a)) | 6 |
| Specific Offense Characteristics: <br> (§2B1.1(b)(1)(D) (more than $70,000 loss) | +8 |
| Adjustment for Role in Offense <br> (§3B1.3) (abuse of position of public trust) | +2 |
| Adjusted Offense Level | 16 |

Because the PSR groups Count 85 and 86 group together in Group II, the combined offense level should be calculated as follows:

|  | Level | Units |
|---|---|---|
| Group I Adjusted Offense Level: | 15 | 1 |
| Group II Adjusted Offense Level: | 16 | 1 |
| Total Number of Units: |  | 2 |
| Greatest of the AOLs: | 16 |  |
| Increase Per §3D1.4: | +2 |  |
| Combined AOL: | 18 |  |
| Adjustment for Acceptance: | -3 |  |
| Total Offense Level: | 15 |  |

Based upon Criminal History Category I, Offense Level 15 yields an Advisory Guidelines Range of 18-24 months.

7.    Restitution

In lieu of the forfeiture agreed to by the parties in Paragraph 10 of the Plea Agreement, the defendant has agreed to pay within approximately one month of sentencing the cash equivalent of his interests in 56 Stage Island Road, Chatham, MA and 184 Bowles Park Extension, Springfield, MA.  The parties have agreed that this amount will satisfy the defendant's restitution obligation.[2]

---

[2]  At sentencing, the parties will provide the Court with the present dollar amount.

8.   <u>Fine</u>

The government respectfully requests that the Court impose a fine equal to "twice the gross gain" received by the defendant. U.S.S.G. §5E1.2, Commentary, Application Notes 2 and 4; 18 U.S.C. § 3571(d) (authorizing a fine of "not more than the greater of twice the gross gain or twice the gross loss"); 18 U.S.C. § 1963(c)(authorizing a fine "not more than twice the gross profits or other proceeds").

Here, the defendant received, at a bare minimum, gross profits or gain of $87,386.35 in gratuities.  Thus, the Court should impose a fine of $174,772.70.  Such a fine signals to this defendant, as well as to others tempted to engage in corrupt behavior, that crime does not pay.

III. <u>Conclusion</u>

For the foregoing reasons, the Government respectfully asks that the Court impose the maximum Guidelines sentence of 24 months and a fine of $174,772.70.

Filed this 17th day of January, 2006.


Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


   /s/ Steven H. Breslow
STEVEN H. BRESLOW
Assistant United States Attorney

24

<u>CERTIFICATE OF SERVICE</u>

Hampden,  ss.                         Springfield, Massachusetts
                                      January 17, 2007


       I, Steven H. Breslow, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing by electronically
filing said motion to:

William J. Cintolo, Esq.
One International Place, Suite 1820
Boston, MA 02110
Counsel for defendant Christopher Asselin


                                   /s/ Steven H. Breslow
                             _____
                             STEVEN H. BRESLOW
                             Assistant United States Attorney