UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| VS. ) | Crim  No. 04-30033-MAP |
| ) | |
| ) | |
| CHRISTOPHER  ASSELIN ) | |
|    Defendant. ) | |
| _____ ) | |

<u>DEFENDANT CHRISTOPHER ASSELIN'S SENTENCING MEMORANDUM</u>

Christopher Asselin incorporates herein all of the objections he submitted to the Probation Officer Richard Rinaldi.  *A copy of the Objections to the Pre-Sentence Report are incorporated herein by reference.*

**I.   THE COURT DETERMINES AN APPROPRIATE SENTENCE BY APPLYING 18 U.S.C. §3553(a).**

Because the sentencing guidelines are advisory under *Booker*, 18 U.S.C. §3553(a) is the standard from which this Court determines an appropriate sentence.  There are four factors identified in 18 U.S.C. §3553(a) that the Court must take into consideration in sentencing Christopher Asselin.  They are:

  (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
  (2) the need for the sentence imposed--
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
  (3) the kinds of sentences available;
  (4) the kinds of sentence and the sentencing range established for--
    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

See *18 U.S.C. §3553(a)*

Under 18 U.S.C. §3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence." 18 U.S.C. §3661. The dictates of §3661 prevail over the policy statements in Part H of the now advisory sentencing guidelines listing the defendant's family circumstances, age, educational background, vocational skills, mental and emotional conditions, among others as "not ordinarily relevant." Under *Booker*, such factors are clearly relevant for purposes of determining an appropriate sentence under the statutory framework.

As will be demonstrated below, a consideration of Christopher Asselin's history and characteristics (18 U.S.C. § 3553(a)(1)) is a major consideration in determining an appropriate sentence.

**II.    THE GUIDELINE CALCULATION CONCERNING THE AMOUNT OF THE LOSS ATTRIBUTABLE TO CHRISTOPHER ASSELIN IS INCORRECT AND RESULTS IN AN IMPROPER 8 LEVEL INCREASE.**

A.    THE ALLEGED ILLEGAL GRATUITIES:

A chart of the funds attributable to Christopher Asselin and Merylina Asselin, as extracted from the Indictment is set forth below.

| INDICTMENT ¶ & PAGE | AMOUNT OF $ | PURPOSE/USE OF FUNDS | DATE | APPLY/NOT |
|---|---|---|---|---|
| 27a - Pg. 23 | $6,630.00 | Campaign – Pynchon Press | 6-24-99 | * before elected |
| 49a - Pg. 26 | $ 630.00 | Catering (campaign) | 6-24-00 | * before elected |
| 54a, Pg. 27 | $3,139.35 | Dell Computer, Office Table & Chair, | 1-17-01 | * Not all |

| Ref | Amount | Description | Date | Note |
|---|---|---|---|---|
| | | Office 32"TV for Art. | | |
| 55a, Pg. 27 | $5,957.51 | New Windows at Jr. & 184 Bowles | 5-21-01 | * Not all |
| 56a - Pg. 27 | $ 650.00 | Tree Cutting | 5-21-01 | |
| 58a, Pg. 27 | $2,100.00 | Labor to Install Windows | ? | * Not all |
| 59a - Pg. 28 | $8,100.00 | Pool Payment | 5-16-01 | |
| 60a - Pg. 28 | $2,100.00 | Pool Payment | 6-08-01 | |
| 63a, Pg. 29 | $5,000.00 | Ext. Painting, 184 Bowles, Trim Work At Joes | 9-6-01 | * Not all |
| 64a - Pg. 29 | $2,480.00 | Campaign Envelopes & Letters | 10-15-01 | |
| 65a, Pg. 29 | $3,502.89 | Washer & Dryer Bowles, Sony Recorder - Art/Big E Olympus Other Digital | 10-15-01 | * Not all |
| 75a - Pg. 31 | $1,570.00 | Catering (campaign) | 4-17-02 | |
| 76a - Pg. 33 | $4,000.00 | Plumbing | Fall 1996 | |
| 80a - Pg. 33 | $2,525.00 | Roof | 12-2-98 | |
| 92a - Pg. 35 | $450.00 | Campaign Signs | 11-16-00 | * before elected |
| 94a - Pg. 35 | $8,700.00 | Campaign Letters 80K, 60K | 12-27-00 | * before elected |
| 100a - Pg. 36 | $5,958.05 | Pool Heater | 9-30-02 | * billed |
| 101a - Pg. 40 | $2,491.32 | Cherry Cabinets | 9-30-96 | * PJ Richfield |
| 102a - Pg. 40 | $2,000.00 | Ext. Painting | 10-1-96 | * PJ Richfield |
| 103a - Pg. 40 | $350.00 | Ceramic Tile Install | 10-1-96 | * PJ Richfield |
| 104a - Pg. 40 | $720.00 | Sanding 5 Rooms (only have 4 rooms) | 10-2-96 | * PJ Richfield |

| | | | | |
|---|---|---|---|---|
| 106a - Pg. 40 | $1,338.24 | 14 Storm Windows | 10-7-97 | * PJ Richfield |
| 111a - Pg. 41 | $1,154.05 | 4 Double Hung Windows | 11-15-97 | * PJ Richfield |
| 115a - Pg. 45 | ?? | Free Carpeting – | approx. 1996 | |
| 119a - Pg. 46 | ?? | Free Carpeting – Office/ Campaign | approx. 2001 | * campaign/00 |
| 133a - Pg. 51 | $3,000.00 | Golf Tourney Gifts | 2002 | |
| 154 - Pg. 62 | $6,840.00 | Rough Wiring | Fall 1996 | |
| 157 - Pg. 62 | $500.00 | Pool Heater Issues | 10-14-96 | |
| 170 - Pg. 65 | $380.00 | Countertop | 10-14-96 | |
| 171 - Pg. 65 | $833.41 | Ceramic Tile | 10-14-96 | |
| 172 - Pg. 65 | $494.05 | Light Fixtures | 11-11-96 | |
| 216 - Pg. 71 | $619.50 | Voter List | 6-12-00 | * before elected |
| 218 - Pg. 71 | $129.50 | 15 Copies Phone List | 9-11-00 | * before elected |
| 219 - Pg. 71 | $96.46 | 24 Copies Street Listing | 9-25-00 | * before elected |
| 221 - Pg. 72 | $128.70 | Furring Strips – Campaign Signs | 11-13-00 | * before elected |
| 230 - Pg. 73 | $59.40 | Shelves | 9-24-01 | |
| 231 - Pg. 73 | $676.09 | 8 Boxes of Avery Labels 2 Large Cabinets | 9-21-01 | * did not get |
| 234 - Pg. 73 | $111.10 | 250 Copies Ward/Street Listing | 3-29-02 | |
| 235 - Pg. 73 | $485.00 | 20 Boxes of Avery Labels | 5-24-02 | |
| Sub-Total | | | | ($25,437.77) |
| **TOTAL** | **$85,899.62** | | | **$60,461.85** |

4

With regard to the expenses paid by PJ Richfield (as denoted by the * in the column at the far right), said expenses were made by Christopher Asselin's brother Joseph as a gift and not as an illegal gratutity. Therefore, these amounts should not be added to the loss figure. In a similar context, the money paid into the campaign before Christopher was elected (also shown with an * in the right hand column) should not be considered in the totals. When both amounts are extracted, the loss figure is less than $70,000. The offense level should be adjusted accordingly.

    **B.**    **THE FUNDS RELATED TO THE ALLEGED HONEST SERVICES MAIL FRAUD:**

The loss calculation ascribed to the Defendant which flows from the allegations set out in paragraphs 228 through 238, i.e., as a consequence of "campaign contributions" made to the committee to elect the defendant to the office of state representative, is incorrect in so far as it includes contributions or payments "in-kind" made to the defendant, or on his behalf, before the defendant was elected to public office.

The Indictment, as drafted, alleged an honest service mail fraud violation (18 U.S.C. §1346) based on contributions made before the defendant was actually elected. After the Defendant pled in this case, the Sixth Circuit decided *United States v. Turner*, 465 F.3d 667 (6th Cir. 2006). In *Turner*, the Court stated that "[t]he plain language of §1346 supports appellants' position that the statute does not cover the conduct outlined in the indictment. While candidates may be dishonest in seeking election, such dishonesty does not deprive anyone of any right to honest "services" for the simple reason that candidates, unlike the elected officials that they hope to become, provide no "services" to the public." By analogy, in the context of the "honest services" prosecutions under

5

§1346 in this case, a distinction must be made between the campaigns Mr. Asselin waged and lost, the campaign activity that occurred before he took office and the actions taken after he was sworn into office.

In light of *Turner,* the loss must be adjusted to include **only** those matters that occurred after Mr. Asselin was actually elected and sworn in. That adjustment is reflected in the bottom line of the right hand column in the chart set forth above.

### III.  CHRISTOPHER ASSELIN REQUESTS A VARIANCE/DEPARTURE BASED ON EXTRAORDINARY FAMILY CIRCUMSTANCES.

#### A.  THIS COURT SHOULD IMPOSE A SENTENCE BELOW THE SENTENCING RANGE SET OUT IN THE GUIDELINE CALCULATION IN THE PRESENTENCE REPORT BASED ON THE HARM THAT THE DEFENDANT'S INCARCERATION WOULD CAUSE TO HIS FAMILY.[1]

This is one of those unusual cases where, in 'one fell swoop' the defendant and his entire family support system has been wiped out. His wife, mother and father and brothers and sisters are all subject to either incarceration or will suffer the consequences of the instant indictment in such a way as to be unavailable to aid in the care and upbringing of the defendant's children, if he were to be incarcerated. Further heaped on this staggering burden is the government's insistence that the defendant and his wife – who was also indicted in the "fell swoop" and suspended without pay from her job as a

---

[1] Christopher Asselin objects to Part E ("Factors That May Warrant Departure") of the Presentence Report. Mr. Asselin says that in light of the sentencing scheme set out in *Booker* and *Fanfan*, which makes the sentencing guidelines advisory rather than mandatory, the search for "factors" that may warrant a "departure" is inapposite to the correct calculus for determining the defendant's appropriate sentence. Rather, the sentence must be rendered by considering all the statutory concerns set out in 18 U.S.C. §3553(a). See United States v. Fanfan, --- U.S. ---, 2005 WL 50108 (2005) ("We conclude that this provision (mandatory) must be severed and excised … So modified, the Federal Sentencing Act makes the Guidelines effectively advisory. It requires a sentencing court to consider Guideline ranges, but permits the court to tailor the sentence in light of other statutory concerns as well.") (internal citations omitted)  A sentencing court need not technically "depart" to impose a sentence below the guideline range, but only impose a reasonable sentence that heeds all the statutory concerns of §3553(a), including the advice of the Guidelines.

teacher as a result of the indictment.-- forfeit all their equity interest in their marital home.

### B.   THE FIRST CIRCUIT ALLOWS DOWNWARD DEPARTURES BASED ON A SHOWING OF "EXTRAORDINARY FAMILY CIRCUMSTANCES."

Even before *Booker* and *Fanfan* were decided, it was within the district court's discretion to grant a downward departure based on extraordinary family circumstances or obligations. "We agree that extraordinary characteristics such as unusual family obligations or exceptional charitable activities may, in certain circumstances, provide a basis for a downward departure." *United States v. Grandmaison*, 77 F.3d 555 (1st Cir. 1996).

The First Circuit has found that a downward departure is appropriate when there is evidence of an exceptional kind of relationship and an exceptional risk of harm to a child if that relationship is broken. *United States v. Schlamo*, 997 F.2d 970 (1st Cir. 1993). In this case, there is evidence of an exceptional kind of relationship between Christopher Asselin and his twin daughters, and, more importantly, there is an exceptional risk of harm to the children if Christopher is unable to continue providing the type of unique care only he can provide to them.

In *Schlamo* the defendant requested a downward departure based on his domestic situation, claiming his extraordinary family circumstances warrant a downward departure. Schalmo was living with a woman and her two children for three years and had developed a crucially important relationship with her twelve-year-old son, James. *Schlamo*, 997 F.2d 970 (1st Cir. 1993). Schalmo argued that his presence at home was vital to James, who was in need of his continuing companionship and guidance. *Schlamo*, 997 F.2d 970 (1st Cir. 1993).

James had been abused by his biological father and was eventually diagnosed with attention deficit hyperactivity disorder. *Schlamo*, 997 F.2d 970 (1st Cir. 1993). The psychologist concluded that Schalmo played a major positive role in James's therapy and that his continued presence was "necessary for James's increasing progress." *Schlamo*, 997 F.2d 970 (1st Cir. 1993). The psychologist warned that Schlamo's "removal from the family would rob all members of a critical source of affection and positive care and clinically could trigger a major regression in James's stability and emotional development." *Schlamo*, 997 F.2d 970 (1st Cir. 1993)[2].

The First Circuit later reevaluated and limited departures for extraordinary family circumstances in two cases, *United States v. Pereira* and *United States v. Thompson*. Before a court can depart downward for "extraordinary family obligations" the trial court must measure the defendant against all other defendants, regardless of his or her crime, and determine whether the defendant is "irreplaceable." *United States v. Lacarubba*, 184 F. Supp. 2d 89 (D. Mass. 2002). The issue is at what point in a continuum between "ordinary" and "significant" burdens are burdens imposed on innocent dependents that are simply not justified by our legitimate need to punish the wrongdoer and are cruel and unnecessary. *Lacarubba*, 184 F. Supp. 2d 89, (D. Mass. 2002).

In *Pereira*, the defendant filed a sentencing memorandum seeking a downward departure to care for his elderly and ill parents claiming that his care constituted an exceptional family circumstance. Pereira estimated that he spent approximately twenty hours per week tending to his parents' needs, including preparing their meals, cleaning their house, doing their laundry, making appointments with their physicians,

---

[2] Seven years after *Schlamo*, the court continued to apply the *Schlamo* standard. The district court in Massachusetts also allowed a downward departure because a defendant's incarceration would result in psychological harm to the children. *United States v. Lopez*, 2000 US Dist. Lexis 21139 (Mass D. Ct. 2000).

administering their medications, helping them with their daily activities, shopping for their food and other necessities, taking care of their finances, and driving the, to appointments and community activities. *U.S. v. Pereira*, 272 F3d 76, (1st Cir. 2001). Departure on those grounds is "permissible" under the first prong of our analysis … only if the circumstances of Pereira's case are "exceptional." *Pereira*, 272 F3d 76, (1st Cir. 2001).

The court in *Pereira* concluded that "the extensive care that Pereira provides his parents … falls short of what the case law has defined as 'extraordinary circumstances'." *Pereira*, 272 F3d 76, (1st Cir. 2001). Though Pereira's circumstances may be "unique," they do not mean that his family circumstances are necessarily "extraordinary." Instead, the crucial question is whether the unique set of facts, taken together, rise to the level of extraordinariness. *Pereira*, 272 F3d 76, (1st Cir. 2001).

**C.   CHRISTOPHER ASSELIN'S FAMILY CIRCUMSTANCES RISE TO THE LEVEL OF EXTRAORDINARY AND WARRANT A DOWNWARD DEPARTURE/VARIANCE.**

**i.   The Children:**

Whether analyzed from the *Lacarubba, Pereira* or *Schalmo* standards, Christopher Asselin's family circumstances warrant a variance/departure from the guidelines. Concerning his twin daughters; his oldest twin Janet suffers from Alopecia Totalis which is a condition which causes all her hair to fall out from all places on her body. In addition to this, Janet also suffers from Atopic Dermatitis which is dry very itchy patches throughout all of her skin. Ointments must be applied to her skin on a regular basis to keep this condition under control. Janet's doctor has indicated that both of these conditions are affected by stress. These conditions have an adverse emotional affect on Janet. Christopher and his wife Merylina both care for their daughter and try to

ameliorate the affects of this condition on their daughter. Christopher's incarceration and extrication from the home and family unit will only exacerbate the stress which contributes to this condition.

### ii.   Merylina and the Family Home:

The adverse affect Christopher's possible incarceration will have on both his daughters and his wife might have been tolerable if the entire familial support system, that one might count on in a situation like the instant matter, was not itself about to be decimated. In this case, virtually every individual that Merylina and the children might otherwise have turned to for help and support will themselves be either incarcerated or suffering from the affects of the incarceration of their husband or significant other.

Since Merylina was herself indicted in this matter, she was suspended from her teaching job without pay. See *M.G.L.A. c. 268A, §25*. Christopher has lost his job and has been unemployable since he was defeated for reelection. The family has spent all their savings and is barely surviving. The family adjusted to these events. Merylina now works two jobs and Christopher must stay home and care for the family. If Christopher is incarcerated, there will be no one to care for the children. Merylina has no significant family in the area and no financial means to pay for the children's care.[3]

Added to this already overwhelming burden is the approaching obligation to purchase the equity from the house to satisfy the government's forfeiture demands. As originally promulgated, the plea agreement called for the Asselins to relinquish their home in satisfaction of the restitution obligation. As such, the Asselins had to try to find someplace to live. Christopher Asselin asked that he be allowed to purchase the equity in

---

[3] Merylina's was born and brought up in Puerto Rico. Her whole family still lives in Puerto Rico. Merylina has one sister, who herself has a family, that lives in the Springfield area. Because of her own family situation, she would be of limited assistance to Merylina and the children.

the house, in lieu of having to up-root his family and find another home for his children to move into. Presumably because the government allowed another defendant to repurchase the equity in his house, it acceded to the defendant Christopher Asselin's request and within the last week agreed to allow Christopher and Merylina to purchase the equity instead of relinquishing the home. Thus, Christopher and Merylina must obtain a mortgage in the amount of approximately $140,000. The ability to obtain a mortgage and keep a roof over the children's heads will be severely hampered by Christopher's incarceration. How conceivably can Merylina take care of the children – with no family support – and take on additional work to pay the additional costs associated with the new mortgage?

The answer to the issue raised in *Lacarubba* -- at what point in the continuum between "ordinary" and "significant" burdens are burdens imposed on innocent dependents that are simply not justified by our legitimate need to punish the wrongdoer and that are cruel and unnecessary – is that, in this situation, the twins, as innocent and partially handicapped will inordinately suffer physically and emotionally by their father's incarceration. *U.S. v. Lacarubba*, 184 F. Supp. 2d 89, (D. Mass. 2002). Under the circumstances, the need to punish Christopher Asselin is far outweighed by the burdens placed on Merulina and the twins.

Even if the the twin's situation does not amount to extraordinary family circumstances, Christopher Asselin is entitled to a variance based on a loss of caretaking, as illustrated above.

## IV.    CONCLUSION

The PSR places Asselin at a Total Offense Level of 14 and a Criminal History Category of I.  The advisory guideline range is 15-21.  Christopher Asselin requests that he be sentenced to a 12 month term of home detention in which he would be required to wear an electronic bracelet – with the ability to work outside the home if he can obtain employment.  The primary reason for the request is to enable Christopher Asselin to care for his children and allow his wife to work so that together they can care for their children.

Under 18 U.S.C. §3553(a), this Court has the authority to impose the sentence recommended by Christopher Asselin because it is required to take into consideration the history and characteristics of the defendant (18 U.S.C. §3553(a)(1)).  In this case, Christopher Asselin's unique history – caring for a physically challenged child – justifies the request.

Taking into account the other factors set forth in 18 U.S.C. §3553(a), such as the protection of the public from further crimes of the defendant (18 U.S.C. §3553(a)(2)(C)) and adequate deterrence to criminal conduct (18 U.S.C. §3553(a)(2)(B)) also supports the sentence Christopher Asselin requests on the principle ground that the conduct by Asselin as a conspirator was aberrant in the sense that it was out of character for him and was not part of a pattern of sustained criminal behavior.  Christopher Asselin, to put it mildly, has learned his lesson.

Thus, for all the reasons set forth herein Christopher Asselin requests leniency from this Court.

                                              Respectfully submitted,
Christopher Asselin, defendant
By his attorney,

/s/ William J. Cintolo

_____
William J. Cintolo, BBO# 084120
COSGROVE EISENBERG & KILEY
One International Place, Suite 1820
Boston, MA 02110
617.439.7775
617.330.8774 (fax)
WCintolo@AOL.COM (email)

Dated: January 17, 2007